EMPLOYERS FIRE INS. CO. v. LANGLEY et al.

No. 6140.

Court of Appeal of Louisiana. Second Circuit.

May 3, 1940.

Rehearing Denied June 10, 1940.

Robert H. Wimberly, of Arcadia, and W. T. Holloway, of Jonesboro, for appellants.

H. W. Ayres, of Jonesboro, and Theus, Grisham, Davis & Leigh, of Monroe, for appellee.

TALIAFERRO, Judge.

The new Ford Tudor sedan of P. I. Harveston, being driven by his wife, was seriously damaged as a result of the side swiping by it of the 1½-ton Ford truck of Joe Langley in the daytime on the graveled highway between Hodge and Arcadia, Louisiana.

Prior to the accident, plaintiff issued to Harveston its policy of insurance whereby he was insured against property damage arising from collision and/or up-set, etc., of the car, as therein defined. The policy was in force when the accident occurred. It carried the customary $50 deductible clause.

The extent of damage to the Harveston car was amicably determined between insurer and insured. The amount thereof was fixed at $707.82. This amount, less the $50 deductible, was paid to Harveston and the holder of mortgage notes against his car. Plaintiff was thereby, as is expressly stipulated in the policy, subrogated to all of the rights and actions which Harveston had or could enforce against Langley and his agent, Lester Blankenship, a young negro man, operator of the truck, arising out of or resulting from said accident and the negligence of Blankenship as the proximate cause thereof. In addition, Harveston sold the damaged car to plaintiff. It was thereafter sold by plaintiff for $155 cash, the best offer made for it after considerable effort to secure a better one.

Plaintiff, as subrogee, instituted this suit against Langley and Blankenship in solido for the amount paid by it to Harveston and his mortgagee, to-wit:—$657.82, on the theory that the accident was solely caused by Blankenship's negligence.

The accident occurred when Mrs. Harveston undertook to pass (on its left side) the Langley truck, which was then in the act of making a left turn across the highway in order to reach a haul road used to transport pulp wood to a nearby mill. Both vehicles were moving northward. The specific acts of carelessness and negligence accredited to Blankenship are as follows, to-wit:

1. Not giving any signal or warning of the intention to make the left turn.

2. Not heeding the signal (sounding of horn) of the Harveston car, giving notice of its presence and intention to pass.

3. Not looking to his rear to ascertain if road conditions warranted the making of the left turn.

4. Attempting to make said left turn when the other car was in the act of passing the truck.

Defendants deny that the accident was due to any extent to Blankenship's negligence, but, on the contrary, to the carelessness and negligence of Mrs. Harveston in these respects to-wit:

1. That she was driving the car in a reckless and careless manner when attempting to pass the truck.

2. That she ran into and against the truck while at stop on its side of the highway without giving signal of her desire or intention to pass.

3. That she did not respond to the signal given by Blankenship (extension of left hand and arm) of his intention to make the left turn.

In the alternative, should it be found that Blankenship was guilty of any negligence whatever, the contributory negligence of Mrs. Harveston in the respects named is pleaded to bar recovery by plaintiff.

Defendants appealed from judgment for $382.82 against them in solido. Plaintiff, by answer to the appeal, insists that the judgment should be increased to the sum of $502.82.

The highway at the locus of the accident is 22 feet wide. It is straight for a considerable distance above and below the point. It is on a fill 4 or 5 feet high, with parallel ditches. On the date of the accident (August 3, 1935) the gravel was loose and dry; traffic thereon, especially at rapid speed, created heavy dust. Each side of the highway was lined with a luxuriant growth of weeds. The presence of the haul road, which the truck intended to take, was not marked. It could not be seen by motorists until very close to it on account of said weeds. An improvised crossing over the ditch to the haul road then consisted of boards laid on poles.

Mrs. Harveston, Blankenship and another negro man were the only eyewitnesses to the accident. She testified that she followed the truck a brief time before the collision; that the dust created by it was somewhat heavy but did not prevent her seeing it at a safe distance; that when it pulled to its right and came to a stop, or practically so, she drew closer to it and construed the truck's movement as evidence that her signal had been heard by its driver, and as an invitation to her to pass; that she immediately maneuvered her own car to accomplish this; that she sounded the horn twice before passing the truck at a speed of between 35 and 40 miles per hour; that without giving any sign or signal of its purpose to do so, the truck began to move to its left across the road; that her front right wheel successfully passed the truck without contact, but that her right rear wheel struck or side swiped the left front fender and wheel of the truck. Immediately, her own car went out of control, turned over two or three times and finally rested on its side across the highway, approximately 75 feet beyond the truck, which was stopped immediately at locus of the accident.

Blankenship and his helper testified (in contradiction of the answer) that the truck did not come to a stop, but was slowly pulled to its right, preliminary to executing a circular movement across the road; that before beginning the turn and while yet on their side of the road, Mrs. Harveston drove her car into the side of the truck. Pertinent to this contention, Blankenship testified as follows:

"Q. Did you look back to see if a car was coming? A. Yes, sir.

"Q. When did you look back? A. Just before—when I held out my hand.

"Q. You held out your hand and looked back? A. Yes, sir.

"Q. Did you see any car coming? A. No, sir.

"Q. Was it too dusty to see it? A. Yes, sir.

"Q. The dust was so bad you couldn't see the car coming? A. Yes, sir.

"Q. And after that you turned around and the accident happened? A. Yes, sir."

The above-quoted testimony of Blankenship tends to prove two points, viz:

That if he extended his hand and arm in token of his intention to turn, he simultaneously looked to the rear for traffic and saw none because of the dust's density, and regardless of his inability in this respect, he undertook to make the turn. If the dust was so dense that he could not see the Harveston car a short distance away, surely that density prevented Mrs. Harveston from seeing the extended hand and arm, if extended.

Three weeks after the accident Blankenship signed a statement covering the facts thereof, wherein inter alia, he said: "At the time of the accident I was driving toward Arcadia, and when I got to near the place where I was going to turn to my left, I looked back and saw a big cloud of dust behind me and I could not see very far to the rear of my truck because of the dust, and because of the dust I did not see anyone behind me and I did not think that there was any danger in turning to the left, and I held out my hand and then made the turn; and just as I made the turn I heard some scream and I heard the noise of a collision and my truck hit the car which was trying to pass me, and I then

pulled back to the right and came to a stop."

The record is silent as to whether the Langley truck was provided with a rear view mirror, a requirement of the statute. Nothing whatever is said by either side in this connection.

Immediately following the accident, the truck was found to be on its side of the highway. However, in addition to the positive evidence of Mrs. Harveston as to its front end's position when hit, there is testimony strongly indicating that the impact shoved or knocked the front end of the light unloaded truck toward its right side more than a foot. This lateral movement caused the tire of the left front wheel to give away.

The fact that the right front wheel and fender of the Harveston car passed beyond the truck without contact, and that the right rear wheel and fender of the car struck or side swiped the left front fender and wheel of the truck, proves one of two things, viz:—that the car was pulled to its right after the front wheel passed the truck, or that the truck was moving diagonally across the road toward the car's proper travel lane when contact occurred. We think the testimony and pertinent circumstances weigh heavily in favor of the latter proposition.

■ The lower court evidently accepted plaintiff's theory of the facts of the accident and the version of Mrs. Harveston regarding the same. We are convinced of the correctness of this factual conclusion. Certainly no manifest error appears.

It is but to restate a familiar rule of law to say that the highest degree of care and caution rests upon and should be exercised by a motorist in making a left turn on a much-traveled public highway, and especially so, as is true in the present case, when the turn is for the purpose of entering a blind or obscure exit or passage therefrom. And such duty becomes more definite and serious, as is also true in the case at bar, when visibility to the driver's rear is materially affected by rising dust.

The truck was going at 35 miles per hour when checked to make the turn. The checking of the vehicle very likely caused the dust to rise cloudlike and enveloped it. This atmospheric condition was not sufficient to prevent Mrs. Harveston from seeing the profile of the truck, but probably was sufficient to prevent its driver from seeing her car a safe distance back of him. If he extended his left hand as he testified, the cloud of dust prevented Mrs. Harveston from observing it. At all events, the atmospheric condition and general surroundings were such as to demand of Blankenship that he not undertake the turn unless and until he knew positively it was safe to do so. He admits that he could not see objects back of his truck after stopping its momentum. He should have realized, and in law is held to have known, that his actions were calculated to invite traffic at his rear to attempt to pass him.

This case falls squarely within the rules announced and/or restated in Vernon v. Gillham et al., La.App., 179 So. 476; Jimes v. Fidelity & Casualty Company of New York et al., La.App., 163 So. 421.

■ The agent of the dealer who sold the car to Harveston inspected it after the accident and offered him $275 on the price of a new one. No trade was made as Harveston was not then desirous of buying anew. Because of this offer, defendants contend that $275 and not $155, the amount the damaged car was sold for, should be credited against the amount sued for. The lower court agreed with this contention. Plaintiff's agent, after the wrecked car was transferred to it by Harveston, offered to sell it to three different car agencies. The price accepted was the best of the offers.

We do not think the conditional offer of $275 the true criterion for fixing the value of the damaged car. In making the offer, the salesman was, to a large extent, influenced by the certainty of profit to accrue from the sale of a new car. He admits he would not have given $275 for the injured car as an investment and also says: "I might have bid a little high and might have lost a little money."

The trade-in value of a damaged motor vehicle is one thing; its cash value is another. Property, damaged or not, is worth no more than the amount it will sell for cash.

For the reasons herein assigned, the judgment appealed from is amended by increasing its amount to $502.82, and as amended, it is affirmed with costs.

DREW, J., dissents.